Good afternoon. May it please the court, Wendy Overmeyer for Brandon Pruitt and I'll reserve five minutes for rebuttal and I'll track my time. Today in asking this court to vacate the convictions, I'll primarily address some jury issues from the second trial, but first I'd like to spend just a few minutes clarifying what the officers knew, their extensive knowledge of Pruitt's home at the time they went and entered illegally to seize the journal on the issue of apparent authority for consent. The officers, the two officers in this case, were not coming to Pruitt's home blind. They had been investigating Pruitt's home for the past 48 hours and one of the officers, Officer Chapman, had actually searched Pruitt's home for five hours just the night before they came back to get the book for identification of residents to identify who lived in the home. Police officers also conducted hours of surveillance on the home. They arrested four people interrogating them in connection with the home, including Pruitt prior to this illegal entry. They froze the home under police control and yet they still didn't know who this woman was when she answered the door. And so without any inquiry, and Chapman, the officer, testifying that her identity was not relevant, they simply accepted her word and went in the door in violation of Illinois v. Rodriguez. And the journal being, oh I'm sorry, was there a question? And the journal being the core of the government's case, the error cannot be harmless and in fact the government does not argue harmlessness in its briefing. So I just wanted to clarify that the officers had extensive knowledge of Pruitt's home when they arrived at the door. And the argument then is that they cannot have believed that the woman at the door had apparent authority. That's the argument? Correct. That's the Illinois Rodriguez standard. It's when a person, even when a person allegedly consenting, asserts that they live there. The question is whether there were facts available and known to the that support a reasonable belief that the person had authority. So you're not now arguing that the district court erred or clearly erred in saying that the woman who answered the door said she lived there. Because there was some question in your briefing. The record was unclear. Chapman's testimony on that point was inconsistent. His report written right after did not include that she stated that she lived there. His testimony waffled a bit at the suppression hearing and it wasn't addressed in his trial testimony. The district court made a finding that she had said I live here and consented to entry. And I don't think Mr. Pruitt said that was a clear error. Is that correct? I don't think you argued it was clearly erroneous. I in the briefing I I believe we said there wasn't enough to support that finding because the testimony was inconsistent. But more importantly, I think even if that was correct, that the woman did say she lived there, that's not enough under the Rodriguez test because of the extensive knowledge they had at the time, it wasn't reasonable for the officers to believe her statement because they had such knowledge about the home and its occupants and they had never seen her before. She was not involved in the search before. She wasn't presence. No one. Um, and we still don't know who she is. They never actually proved her identity. And, um, so that requires suppression of the journal and to vacate both trials. Now, as I think about that, yes, they knew quite a bit about the house beforehand. How big was the was the residence? I'm not entirely sure. It was an apartment. I'm sorry, not house. Yeah, it was an apartment. There was certainly one separate bedroom because that was the mass. There was a master bedroom, and that's where Pruitt's identification and they knew that Pruitt lived there and that he owns the offhand how many bedrooms there were, if that was in the record. But what I'm what I'm having trouble with here is that, yes, they might have been there before. Yes, they might have known the size of it. Yes, they did know something about who was living there, but it wasn't as though they had an intimate knowledge of that apartment who came and went for the previous old couple of weeks or months. It was just a couple of days. Um, and it's common and not just in the experience of people who might be engaged in criminal behavior, but common for all kinds of people for all kinds of reasons that people go in and out all the time. And there might have been three or four people living there in the sense of living there with sufficient authority to say yes or no to come into the apartment. I'm not sure I'm convinced by the fact that they couldn't by the fact that they had some knowledge about the apartment that they had to disbelieve her when she said, yes, I live here. That's that's the test of again of Rodriguez, because in a lot of cases, police are coming to the home, not knowing anything about the home. And here that was very much different because they had been watching the home so closely in the 48 hours directly before this. So, you know, where someone was coming in and out of the home, you know, is not is also not the same question as whether that person would have had authority over the premises to grant consent to enter or to search. Were these arguments made to the jury? The issue of consent to come in was not made to the jury. It was made of the suppression hearing that the woman lacked apparent authority and that had to be ruled on by the magistrate and the district court. And the magistrate didn't address the apparent authority test in her opinion. And the district court just adopted her opinion without discussion, again, without going through the three step apparent authority test. And so we asked for reversal on that denial of suppression. And if I could get to the jury errors at the second trial, there were two critical jury errors that secured the conviction for the government, in addition to other errors that I won't have time for today. The first is planted juror bias with the individual instruction to juror K about presuming law enforcement witnesses tell the truth. And the second, the constructive amendment. So I can talk about the juror K instruction first. It was at sidebar and voir dire. She was individually instructed by the district court, can you presume with the instruction? Can you let them start with the presumption that they're telling the truth and then decide credibility based on there? And she said, absolutely. And that the presumption of truth instruction is universally disfavored since at least the 1970s in federal court. And so it's our argument that this is a structural error, because it during instruction that is related to the burden of proof, that is a special category of jury instruction error that renders it structural. The government argues that the district court statement under our case law can be sanitized by curative instructions. In fact, the district court gave those the jury to weigh credibility. Do you want to address that argument? Yes, Your Honor. Thank you. So the right after the instruction was provided directly to juror K that you should preserve presume law enforcement tells the truth, there wasn't an immediate correction. And in the cases, the government sites, it is, I believe, Miller and one other case, there was an immediately realized, oh, I shouldn't have said that I'm going to give an immediate correction. Here, there was simply much later at the end of trial, there was the general instructions and the general instructions on presumption of innocence and burden of proof as to the elements, but not specifically, you know, an instruction as to witnesses, and then the credibility instruction given at the end of trial. Again, it didn't say, don't presume these witnesses are to determine the credibility of the witness. So whether this is reviewed structurally or not, it affected the verdict. And the unique circumstances of this case really require reversal because of this instruction. And that would be that the first jury hung. This was not a case of overwhelming evidence. And then this instruction was given that the second trial where the jury convicted. And this is also an instance, which is more unusual, it does happen, but where the court has given the instruction that leads to the jurors actual bias. And when it's from the court, the court has the greatest influence on the jury, that the Supreme Court held a long time ago in Corsair, Corsia, which is given in our briefs, that was a 1933 case on a incorrect error given by a trial judge. And it and it goes through how that's very firmly implanted, you know, when a court instruction individual juror personally, that's very firmly rooted in that jurors minds, and it's unlikely a general instruction will undo that. And because also it favors the government's witnesses here. All of the government's witnesses, the majority were law enforcement officers. So to presume law enforcement officers tell the truth, but not presume any other witnesses are, was very much in the government's favor, particularly where the government's expert, so called expert, was also a law enforcement witness. Now, this conversation with the juror, was that in the hearing of any of the other jurors? No, this was that sidebar. I heard it was a sidebar. But sometimes sidebars are out loud. But it's just just this one juror heard this. I believe it was just the one juror, they were discussing an earlier answer that she gave regarding her experience with the criminal justice system. Of course, we don't know if this juror shared this with any of the other jurors. That's not, you know, that's not in the record. And if I could get to the final jury error here for the second trial, that also took the scales in the government's favor was the count. And it was not only was it changed from the first trial, as to a particular element, the jury was told by the government to circle the change, to circle this word anyone would cause that was not included in the first trial. And the government argued in its closing, all they had to prove was the defendant knew that the victim was a prostitute. Now, there's not enough under the statute. And this it has to be the acts the defendant intends to take that he means to cause the action, how the Seventh Circuit described it. And that's how that the victim will be caused. It's an odd sort of formulation is passive voice. Yeah, it's a future tense passive. Yes. We're talking literal meaning. Did the district judge change the meaning of the of the criminal behavior by saying caused by anyone? Yes, it did. What it did is it broadens the conduct that was narrows because anyone requires that it be a person. And I as I read that law, independent of the sort of the elaborate instruction, because it could have been caused by other things, by things that were not by people, that is to say, extreme poverty, various forms of duress, and so on. It seems to me this is a narrowing instruction. The way that this court has interpreted 1591 is that it has to be part of the defendant has to have a modus operandi, a defendant has to have a plan that will cause the victim to engage in prostitution, that doesn't have to ultimately be successful. But there has to be a defendant's plan. So by making this anyone would cause it takes it out of the defendant's actions and the defendant's liability, and allows conviction based on conducts that is not the defendant's. And so I couldn't find any case law, whether it's this circuit or other circuits, where there's been a conviction based on something other than the defendant's plans and planned actions. And that's precisely what the jury was told here that it could be anyone's anyone would cause this. And then, of course, you're not here to decide who caused her to be a prostitute, you're here to decide, did he know she was prostituting. And 1591 is a mandatory minimum of 10 years, it requires more than just knowing that someone is engaging in prostitution, it requires causing that person to engage in prostitution, whether it's the supplier who's convicted, or whether it's the customer who's convicted, there still has to be action in the plan, or planned action on the part of the defendant. And no other circuit uses this instruction. And it wasn't this court's model instruction, which the court gave at the first trial was the model instruction, and the jury hung on that issue. You know, you can sense the judge changes it because the jury hung. Right, absolutely. Yes, the jury had some questions about this particular element, the first jury. And so by, you know, the court wanted to make that element clear to the jury, but in doing so, it broadened it beyond the scope of the statute, forming a constructive amendment. And unless there's other questions, I'll reserve my time. Okay, let's hear from the other side. And you've got some time. Thank you. Can you can you hear me? Okay. All right. Good afternoon. May it please the court. Good afternoon, counsel Elizabeth White for the United States. I'll address the three issues in reverse order, just because the constructive amendment is fresh in my mind. Neither the statute nor the indictment, nor this court's model jury instruction requires that the defendant's action be the cause of the victim engaging in a commercial sex act. What the statute says is that the defendant has to, the court harbor, I mean, there is an active requirement of things that the defendant must do. The second element is that the defendant must know or have reason to believe that the victim will be caused to engage in a commercial sex act. And what the Supreme Court has said in Dean is that when Congress uses that passive voice for an action, it reflects agnosticism as to who caused the action. It doesn't matter who caused her to engage in the sex act. She just has to have been caused to do so. And that's what the Eighth Circuit said that in Youngers, that the passive construction in this statute reflects agnosticism about who causes the child to engage in the commercial sex act. Now, in response to Judge Fletcher's question, I hadn't even thought, I mean, my answer would be that the way that the judge revised the jury instruction didn't change it at all. It certainly didn't broaden it, but I think you're right that it actually did narrow it because that agnosticism essentially means that what the statute says, or what the statute means, is that the defendant has to know or recklessly disregard that the fact that the victim will be caused by anyone or anything to engage in a commercial sex act. And the judge narrowed that to anyone and then flipped it to be in the active voice, thinking that the jury might have an easier time interpreting that in the active voice rather than the passive voice. But it didn't change. If I can be a grammarian, he kept it in the passive voice, but he specified who was going to do it. Yes, yeah. If we're going to be grammarian, I think we're going to have to determine the difference between the pluperfect subjunctive and the passive subjunctive. This is so far outside my wheelhouse, Your Honor. I think that one of the issues in terms of this court's cases, that both sides relied on their briefing, the Todd and Backman case, where in Backman, the Ninth Circuit said causation is not an element of this offense. But in both Backman and Todd, the court was looking at the other piece of this statute. Because remember, this statute is sex trafficking of children or sex trafficking by fraud or violence or coercion, right? And both Todd and Backman involved the sex trafficking by fraud and fraud, force and violence, I think is the phrase. And that second element, when you're talking about that piece of the statute, the government has to prove that the defendant knew that force or violence or fraud will be used to cause the victim to engage in a commercial sex act. So at least on that half of it, even though it still doesn't say that the defendant has to be the one to do it, or the defendant has to be the one to cause it, there is sort of a causation piece in that. Because the government has to prove that the force and violence will be used to cause. Whereas here, when we're talking about the sex trafficking of children, that piece doesn't apply. And you're just talking about the defendant has to actively, knowingly entice, harbor, support, whatever, that whole list of verbs, and has to do so knowing that the child will be caused to engage in a sex act. So I don't believe that there's any constructive amendment there. I think the court was, you know, thinking that this verbiage might be easier for the jury to understand, but I don't think at the end of the day it resulted in any change to the meaning of the statute. With respect to the question of the prospective juror at sidebar, we call this language in our brief, inartful, and I think that it was. I think this was a fairly lengthy... I was about to say it was more than inartful, it was wrong. Okay, I think that what the judge was getting at, if you read the entire, you know, three, four pages of colloquy about all of this, right, the court was trying to get confirmation that this prospective juror was not going to be biased, and was going to be able to listen to the evidence with an open mind, and wasn't going to be influenced by this prior situation that she had had with her son, and with the criminal justice system. Your best argument, it seems to me, is no error, then, that this was cured by the subsequent instructions of the court? Yes, well, that is one of my arguments, yes. I mean, I think that a challenge during instruction, to the extent that you consider this a jury instruction, and I question that just a little bit. The judge made this comment, which, as far as we can tell from the record, escaped everyone's notice. I mean, this was something that was said... Milner didn't involve jury instruction, it involved questions of court error, didn't it? Yes, yes, but what the court said in Milner is whether the judge's conduct violated the defendant's right to fair trial is the question, and a new trial is unwarranted unless the defendant demonstrates both an inappropriate remark and prejudice. What we have here is, you can see from the transcript, that the juror and the judge are kind of talking over each other a little bit. The judge made this comment, and it completely escaped everyone's notice. And I will say, you know, in their brief, Pruitt characterizes this comment as the district court's specific instruction to Juror K to automatically believe the Now, that's not how I read that statement. I think if the judge had said, I specifically instruct you to automatically believe the government's witnesses, that is not a comment that would have escaped anyone's notice. I mean, I think the prosecutor would have said, whoa, heck, let's back up here and try again, right? I mean, I think that this was a passing comment, and after which, the juror said she would absolutely keep an open mind, would listen fairly to all the evidence. The defense counsel was standing, I mean, the only thing, it was the judge, the prospective juror, the prosecutor, defense counsel, and the court reporter. Defense counsel didn't think enough of it to raise any sort of objection now. And when considering that, I mean, even if you accept that, yeah, no, this is not how the judge should have said this, and I'll accept that this is not how the judge should have said this, but you do have to consider whether this demonstrates, you know, whether the judge has created prejudice. Now, what the defendant says is that this statement, unobjected to, unnoticed, turned this juror into a biased juror, and therefore, it's structural error. And I just, I don't see any case, and I don't think they signed into the case, and I haven't found a case that says that a judge's comment can make a juror biased to the extent that you don't, evaluate that in light of all of the other jury instructions, that you don't go through that analysis. I mean, it is true that the presence of a biased juror can be structural error, but that is assuming that this was a biased juror. What she said over and over, absolutely, she can keep a firm, you know, she can keep an open mind, she can, she's not going to be biased against the defense counsel. It came out, she was actually kind of mad about her son's lawyers, and so then there was a discussion about whether she would be biased against defense counsel, and she said, absolutely not, absolutely not. And at the end of that entire discussion, the judge turned to both of the lawyers, prosecution and defense, and says, does anybody want to object for cause? And both sides said, no, your honor. So, I think, I mean, I do think that, you know, this is one of those situations where there is no such thing as a perfect trial, right? There's no such thing as a trial where nobody makes a mistake, and nobody misspeaks, you know, this is, especially. So, are you arguing, in effect, that by inviting defense counsel to state an objection for cause, and defense counsel's declining to do so, that that, when you think it happens after that, it's basically invited error? Is that the suggestion here? Oh, I don't think I would go that far, but I would say that the question of whether there was a biased juror on the jury, right? You have to look at all of it together. You have to look at not only this statement that the court made that it should have worded differently, but you have to look at the fact that, in the moment, the people who were there didn't think enough of this comment to object. And then you have to look at the fact that the judge properly and correctly instructed the juror that the defendant has a presumption of innocence. That the scales are tipped in his favor. That the jury is the one that decides the credibility of witnesses. That nothing the judge has said or done should suggest to the jurors in any way, shape, or form, which way he thinks they should decide these issues. So, I mean, I think that when you look at all of that as a whole, I don't think that one piece, I mean, I don't think you can always say that a defense attorney's failure to object to a juror turns that juror into invited error, because I think there are probably circumstances where that's not the case. But I do think that looking at this as a whole, you just don't have that kind of, I mean, you have to evaluate it as a whole. I don't think you can assume that this one comment by the judge, which went unnoticed by everyone, turned this prospective juror, who otherwise had said repeatedly that she would be able to be fair and impartial, into a biased juror to the extent that now we're talking about structural error. I just, I think that that is a bridge too far. With respect to the journal and the entry into the apartment, I think that there are about six different really fascinating legal questions in this issue. But first of all, the magistrate judge made three specific findings that I think are worth noting. One is she found the officer who testified at the suppression hearing incredible. Second, she found flat out the officers did not conduct a search. I mean, after they were let into the apartment on that second trip by the black woman and the victim who was also standing at the door, there was some discussion about which one of them invited them in, whether they were both at the door. He testified at the suppression hearing that the door was open and they were kind of both there. It may be that the victim was walking from the back of the apartment as the other woman opened the door, but eventually they were there together. In any event, after they came in, there was no search, right? After they came in, the officers, the two officers, each had a conversation with the two women. And the victim in this case asked the officer to speak privately, went into another room because she didn't want to have the conversation in front of the other woman, broke down crying, said she wanted to get out of this prostitution business, that Pruitt was her pimp and that she wanted out. And the officer said to her, you know, I was here the other day and I saw this journal that you wrote about this stuff. You know, first he said, would you come down to the police station to talk with me? And she said, yes. And he said, you know, can we take your journal with us? And she said, yes. She consensually went with him. She consensually, she agreed to allow the officer to take the journal down with him. So there was no, there wasn't. Did the officer take the journal or did she bring the journal with her when she came to the station? He carried the journal. There was some discussion that, so I, there was some sort of fear of the other woman that was in the apartment. And so what he said is, if you'd like, I can handcuff you and walk you out of the apartment so that she doesn't know that you're coming with me to talk to me about this. And the victim said, yes, I'd like to do that. So he handcuffed her to take her out of the apartment. And he had the journal in his hand as he's walking her out. But the magistrate. So the two of them then go together to the station? Yes, yes. And they talked through all of this. Now, so first of all, the apparent authority doctrine, right, what this court, what the Supreme Court said in Illinois v. Rodriguez is that even if someone, the question in Illinois v. Rodriguez is, do the police violate the Fourth Amendment when they go into a And the Supreme Court said, yes, apparently, and that's the apparent authority doctrine. If the if the police are reasonable in believing that the person who is letting them in has the authority to do that, then that does not violate the Fourth Amendment. And then they said, and this is context or dicta, depending on how you how you put it, because in the case of Illinois, Rodriguez, they said that there was no violation. But they said that this doesn't suggest that law officers should could always just take a person's word for it. Right. Because there could be circumstances that could conceivably be such that even if somebody says they live there, the officers wouldn't be reasonable in believing them. OK, so that it's an it is an exception. And then this court applied that in the United States v. Reid. And I think that interesting thing about United States v. Reid is, first of all, the officers had really specific reasons to disbelieve or to not think that the person who answered the door lived there. I mean, there were, for example, that this was an apartment and there was a parking spot for that apartment and there was a car that had always parked in that spot. And they've been surveilling the apartment for a really long time. And they knew that apartment 101, there's a there's a Lexus that parks in that spot. And when he answered the door, they said, do you know whose car that is? And he says no. Now, that was his apartment. He would know who is parking their car routinely in that parking spot. Right. So they had reasons. They also they actually also knew the names of the people who were on the lease and his name was not one of them. It's like they had a lot of information. And so what this court said was they shouldn't have just accepted his invitation in. Instead, they should have asked him if he lived there. Right. Now, I don't know if that in light of all of the other circumstances, whether that would have been enough. But but they weren't saying that you can't take somebody's word for it. They're saying that there could be a situation where there are circumstances that would not make it reasonable for you to take someone's word for it. And here they open the door. The woman opens the door. She says that the officer testified at the suppression hearing that she said she lived there. The other the victim who who absolutely did live there. And to the extent that she acquiesced, I mean, the officers came in and she didn't say get out. I mean, there's no question in the record whatsoever that she lived there. So whether she was the one who invited them in or whether she acquiesced to them being there and didn't ask them to leave, I mean, I don't think that there's any real clear case law on on that line, but but in any event, so she had actual authority. The other woman had apparent authority in the case that she opened the door. She said she lived there. She said she didn't want to be talking about this out on the porch because she didn't want the neighbors to hear. And so then she either invited them in or the officers asked if they could come in and she said yes. But there's but there's nothing in the record that would make it unreasonable for the officers to believe her when she presented that apparent authority. Now here an argument I my colleague, your head has now suggested some reasons that maybe the officers shouldn't have believed her, you know, that that they hadn't seen her at the apartment the other day. I think the fact that somebody isn't at an apartment one day doesn't give you reason to doubt that they live there when they're there another day. I mean, I don't think that being in and of itself would do it. And whether there's more than that, a lot of this stuff was not briefed in the district court. And obviously, you know, the big piece of this, the victim who absolutely lived in the apartment and was there, she was not available at the time of the suppression hearing that the district court had actually already, I think it was before this, had already made a finding that the defendant's misconduct had made her unavailable. But so she wasn't there to testify whether she gave the actual authority. But I guess going back to my earlier point, even if the consent or the entry was improper, what the Supreme Court has said is that when the police cannot go into a place without a warrant, into a home without a warrant, to arrest someone or to search or seize, right? Well, here they weren't arresting anybody. They did not conduct a search. And there was nothing about her coming, agreeing to come to the police station with them, agreeing to let them bring her journal with her. That was a result of the fact that they had that conversation inside the house rather than outside the house. If I could just have 10 seconds for an analogy. They were, the police had been, thank you, the police had been investigating a burglary. And I think that if they had not had proper consent to go in, and if they had gone in, and if they had seen proceeds from the burglary laying around the house, right? That's the kind of thing that would have to be suppressed because that's evidence that came out as a result of their being inside the house rather than outside the house. This conversation with the victim, there's nothing to suggest that that was a result of their being inside the apartment rather than outside the apartment. Thank you for letting me go over my time. If you have any questions, I'm happy to answer them. I think not. Thank you. Thank you. Thank you, Your Honor. I'll address the consent issue first, because that's where the government's argument ended. And there's only one question here, and that's if there was apparent authority to enter Pruitt's home. Everything that happened after the moment of entry is a violation of the Fourth Amendment. This exception is very narrowly construed, as are all exceptions. Why is everything that happened afterwards a violation of the Fourth Amendment? Let's assume that they should not have believed that that woman had apparent authority. They come in and we just heard an argument that what they did was not a search and a seizure. They came in, they met the victim who voluntarily said, I'm so glad you're here. Come talk to me. Save me. So why is that a violation? Because it's the evidence that they seized as a result of their entry, which is the journal that the victim did not offer. Look, I have this journal. Let me ask you this. Did they seize it at the time? That is to say, she voluntarily says, hey, yes, you can have it. Is that a seizure? Or is that just her handing it over? That's handing it over to their authority. Yes. So it's our it's our position that that's a seizure because they asked her, we saw this journal. That's your journal. Please bring this with you. We want this. You know, we want you to get me to the point that I'm actually interested in. The day before, did they have any right to be there? The day before when they were searching the day before. Yes, they had a search warrant. So they were there the day before and they had seen the journal at that time and was the journal at that time permissible? Seeing the journal at that time, it was out in plain sight and they had permission. So the reason they knew about it was a permissible that they had come to that knowledge of the journal permissibly. Yes. OK, yes, it was in plain sight and they looked at it to see if it would identify who resided in the apartment. It wasn't covered by the search. So when they come in the next day and they ask about the journal, they were allowed to know that the journal existed and it belonged to her. Yes. OK. They were not allowed to enter the apartment without a warrant. No, I get that. I get that point. I'm trying to figure out the status of the journal at the time they come in the second time. OK, got it. And because like Reed, they had all all of these specific reasons not to believe that the woman lived at the apartment and it was objectively unreasonable for them to opt to. But I heard you argue earlier that they'd been having this house under surveillance for a while and therefore they knew or should have known that this woman didn't live there. And Judge Fletcher asked you some questions that from my perspective sounded skeptical. So I'll ask if I'm equally skeptical or perhaps even more so, I don't understand your argument. Why should they have known by virtue of the earlier surveillance that this woman did not reside there? What is the objective evidence that we're supposed to consider in our determination that that statement is correct and should be credited? The woman was was seen during the surveillance coming in and out of the apartment for the past. So, so, so. And OK, and the there was no identification of the woman at the time she answered or when they searched the apartment, they didn't obtain any information that that woman lived in that apartment and they talked with Pruitt and other people associated with the of those interrogations or that I just don't see how Ruiz is triggered by any of those comments that you just made or argument that you've made. It seems to me that Ruiz requires a great deal more than these kind of suppositions that you throw up in the air that we're supposed to accept as proof that she didn't live there. I'm not persuaded yet that she didn't. It wasn't there some suggestion that she might even be related to the defendant? That was not known to the officers at the time they entered that came after the time of entry. So during the during the questioning, when the young lady said to the officers, I'd like to speak to you. She asked to speak privately because she didn't want the woman to hear. I thought that in that exchange, there was some suggestion that there was some either social or some familial relationship. What are the other between the two of them? There was there was that is what the what the victim said again after the police had entered the apartment. But again, a familial relation is not the same as authority. It was like, yes, that's it. Thank you. And OK, and to push you further, further outside, I'm out of time. If the court would like me, I can go on to just address the bias juror issue that the government keeps saying no. Quite, quite clearly in mind, you know, you made a very good argument on that one. So I'll rest on my argument. Thank you. Thank both sides for your very helpful arguments. The case of United States versus now submitted for decision. And we're in adjournment for the day. Thank you very much.
judges: Lucero, W. Fletcher, Ikuta